Page 45 of the A2D cited their opinion. In this case, Mr. Brudeau testified at page 1630 of the appendix quote, it's not as if I asked him about his background. I never really sat down and said, tell me about his background. Mr. Rowlands at page 1851, the penalty phase preparation, at least in my mind, did not begin in earnest until after a first degree verdict was obtained. At page 1853, he's asked a question. Did you request interviews of various family members? Answer. No, none of them was done pre-trial. Um, they simply didn't do a social history investigation. Now, let me just address while I'm on that. What was Owens? Was Owens out there doing anything during the course of the trial or the way to tie for the conviction? Owens testimony was absolutely clear that preparation began after the verdict. Um, all this stuff about Dr. Tepper, uh, being hired is squarely addressed by Wiggins makes a distinction between the act of hiring a mental health expert and the act of conducting a social history investigation. And what Wiggins says is quote, counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background. Those are two distinct close quote. Those are two distinct acts counsel is required to do. Um, and in this case, Owens testified absolutely clearly that page 1870 that there was no social history done in this case. Mr. Bruno laid it out perfectly clearly. He talked to the family about the status of the case. There was the first case in the second case. Before the second case started, they talked only about the status of the case. While they were waiting for the verdict in the first case, they talked about mitigation for a possible penalty phase in the first case. At that point, as he said, quote, the big thought close quote was that they would put on the fact that Mr Bond had no prior convictions and some good deeds that he did. Obviously that went out the window once he's convicted in the first case as a strategy for the second case. Between the first trial and the second trial, Bruno and Owens are clear as a bell that they did not ever, ever, ever talk to the family about anything related to Mr Bond's background. They did zero investigation, and the Pennsylvania Supreme Court's findings to the contrary are unreasonable. They are not in the record. They did not talk to the family about mitigation, and all they did was they hired temper. And as Wiggins says, that's not what he says. Well, gee, they sure could have asked the family about it, couldn't they? They could have gotten the school records. They could have they could have conversed with their expert who made findings about a difficult time in school. I was about to get to the point that Mr Dolgen has talked about fooling people. And you know, the records in this case are not as voluminous as some of our cases, but I sure don't think it's it's fooling anyone when you look at the records. I mean, this is on page thirty nine of our step three brief. When the truant officer arises, I'm sorry to interrupt you, but help me out and tell me what is there in the testimony at the post-conviction hearing that would have influenced a juror to find another verdict? What is the most serious? OK, well, the records I was about to address are very serious. For one thing, they're not subject to any credibility analysis. They're the records. And what the record says is that on February 7th, 1977, when Mr. Bond was ten years old, the truant officer showed up at his house and wrote, quote, family has had no heat and hot water since one twenty one seventy seven for two weeks. Goes on to say, quote, Jesse has been on the streets due to Mrs. Bond sending him out to work. So he's a fourth grader, 10 years old. The United States Supreme Court has said since nineteen eighty two in Eddingsville, Oklahoma, that just the type of evidence your honor has referred to is highly relevant in the capital sentencing phase. I think all of that is relevant on the issue of the first trial of Strickland, but there hasn't been too much discussion of the second trial. Sure. In prejudice, again, you have to compare what was presented with what wasn't presented. And the cases we've cited, particularly Williams, Alton, Germaine, Williams, they all speak to the fact that the failure to present due to a failure to investigate that type of evidence is prejudicial. And I make one other point in terms of the reasonableness of the Pennsylvania Supreme Court's decision that there's no prejudice in this case to the extent one can discern a prejudice analysis. I'll grant you that all of what you are arguing is very relevant to the first trial of Strickland. I'll make that concession. Okay. The Pennsylvania Supreme Court violated the holding in Williams when they considered... The point is, what's the prejudice in all this? The prejudice is that one juror could have said, oh my goodness, this child has had a deprived, abusive, neglectful childhood, upbringing, poverty stricken, he's borderline mentally retarded, as Jake Fulham found, and that's a reason to vote for life. That's the reasonable probability of a different outcome. All of these things. Is that really relevant on the question of whether it's life or death, or is that relevant to the guilt phase of the trial? I know what these various cases... Maybe I'm wrong, but it seems to me that most of these cases go into the first prong of Strickland. We don't have many decisions and many discussions of the second prong. And that's what bothers me. To answer your Honor's question, that evidence is relevant to both deficient performance, it's the evidence that counsel failed to investigate and present, and unreasonably so, and it is relevant to prejudice. The likelihood of a different outcome. I assume my time is up. I don't know if the court has additional questions. Thank you very much. Thank you, Your Honor. Just a couple of very quick points. I just want to make the overall point that it's important to be rigorous here. And there are a few things that Judge Fulham said below that I think point out sort of the lack of rigor that we've encountered to this point. Judge Fulham says, as a teenager, Mr. Bond was struck in the head and was hospitalized for nine days. That's not true. He was hospitalized for one day. He was unconscious for 15 minutes. There was no objective indication from that suggesting brain damage. The CAT scanning was clean. He was given awareness tests that were clean. Is it possible he suffered brain damage? Anything's possible. I think his point is there could have been this information brought forward to let, at the sentencing phase, these determinations be made that this information was not brought forward when it should have been. But it's also important, I mean, I agree. Because you may prevail. You may have prevailed even if it was brought forward. I agree that that's ultimately his point. But I think it's also important not to exaggerate what's actually there. Judge Fulham also said that, according to school records, he was at best borderline retarded. That's not true. There's no such diagnosis in the school records. And all the IQ testing in this case showed him in the low average range, which is above the borderline range. We're talking about scores of 80 and 88. That's not borderline retarded. Judge Fulham said Bond's lawyers did not actually begin to prepare for the penalty phase until after the guilty verdict. I don't want to – that's not true. Because we know that, for example, Mr. Bond's lawyers retained Dr. Tepper before the trial, before the penalty phase. Now, again, the reason I'm hesitating is I don't want to make claims that aren't true. We don't know much about what Mr. Bruno did. He says he talked to the family members. Mr. Wiseman says he never talked to the family members about family background. I think it's a lot more vague than that, about what they actually talked about. But the point is, school records show no trauma. The jurors who listened to the original penalty phase were aware that this was not a rich family. I don't mean to minimize the effects of poverty, but in this case, I know this court will give it a fair reading. And to look at the evidence that was actually presented both at the actual penalty phase and in the PCRA hearing, and ultimately at the end of the day, there's some serious gaps here. And the state court's rejection of this claim was more than reasonable. And I think when the state court said that there was no prejudice from the failure to put on these family witnesses, Mr. Wiseman says that that wasn't a credibility finding. Well, maybe not technically. I guess that's sort of right. But when you say there's no prejudice, you're saying either it's not credible, this testimony, or it's weak, or it's cumulative. You're saying something about that testimony. And it's clear that if Judge Sabat had thought that testimony had been convincing and devastating, he would have granted relief. And so would the Pennsylvania Supreme Court. If there are no other questions. Thank you. I want to thank all counsel, not just Mr. Dulgeness and Mr. Wiseman, for exceptionally well-done briefs. I want to thank Mr. Dulgeness and Mr. Wiseman for an exceptionally well-done oral argument. We'll take the matter under advisement because Judge Alderson, Judge Smith and I will be conferring very shortly thereafter via teleconference. I would ask that the courtroom be cleared as quickly as possible. And if Patrick, you would just have to make sure the doors are locked. Judge Ambrose, could we have a transcript of this oral argument prepared? Certainly. If we could have a transcript, if you would check with the clerk's office to have a transcript prepared. And I would ask that it be done at the Commonwealth's expense, if it could, please. Thank you.